# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JIMMY HARRIS,

        Plaintiff,

    v.

CITY OF MILWAUKEE, OFFICER FROILAN
SANTIAGO, OFFICER MARK KAPUSTA,
OFFICER STEVEN STELTER, CHIEF OF
POLICE EDWARD FLYNN, and
SERGEANT WALTER MUCULOUGH,

        Defendants

Case No.: 14-CV-1002

Jury Trial Demanded

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Jimmy Harris ("Harris"), by his attorneys, Cade Law Group LLC, hereby submits this brief in opposition to Defendants' Motions for Summary Judgment.

## <u>INTRODUCTION</u>

Chief Edward Flynn,[1] when deposed in this case, summed up the reason this case is before the Court: "I would say the situation got out of control." Declaration of Nathaniel Cade, Jr. ("Cade Decl."), at Ex. 8, at 47:21.

Here, Jimmy Harris had just left the hospital and was driving himself home when he had the misfortune of being in an area patrolled by Officer Froilan Santiago ("Santiago") of the Milwaukee Police Department ("Department"). Mr. Harris' purported crime is that he was driving a dark-colored vehicle and Santiago decided to initiate a

---

[1] Flynn was the Chief of police for the Milwaukee Police Department at the time the lawsuit was filed, but recently resigned from the department.

stop because he did not believe that the vehicle's color matched the color contained in the Wisconsin Department of Transportation's database. Harris had committed no crime, was never charged with a crime, and to this day, still wonders why Santiago decided to escalate the situation from a purported misunderstanding to an injury that has left Harris permanently disabled in his left arm.

As Defendants note in their summary judgment brief, ". . . the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Defendants' Brief, at 6, citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Harris submits that Santiago and the other individual defendants were either incompetent and ignorant of the law as it pertained to initiating a traffic stop, or knowingly chose to ignore the law. Either way, liability attaches under 42 U.S.C. § 1983 and the individual defendants do not receive any protection for qualified immunity.

## FACTS

Harris agrees with all of the of Defendants' Proposed Findings of Facts ("DPFOF")[2] except DPFOF 29, 33, 26, 38 and 40 because these are Attorney Smokowicz's interpretation of the video.

Harris made a turn onto westbound North Avenue on November 19, 2010 at approximately 4:43 p.m. DPFOF 3, 9. Officer Santiago was in his patrol car and followed behind Harris and made the decision to check Harris' license plates. PFOF 1; Cade Decl., at Ex. 3, at 1; DPFOF 10, 21, 23. After running the license plates of Harris' vehicle

---

[2] In citing to certain affidavits, unfortunately, Defendants failed to place into the Record complete deposition transcripts, as opposed to snippets of pages where facts can be taken out of context. Plaintiff, through his counsel, has corrected that error. Harris shall refer to his proposed findings of fact as Plaintiff's Proposed Findings of Fact ("PPFOF") and shall refer to the facts proposed by Defendants as Defendants' Proposed Findings of Fact ("DPFOF").

("vehicle"), Santiago allegedly observed that the Department of Transportation records indicated that the vehicle should be gray, but Santiago believed the color to be black. DPFOF 30. Santiago informed the Department dispatcher that he was pulling over the vehicle due to a color discrepancy per the DOT records. PPFOF 2; DPFOF 30.

Santiago immediately turned on the lights of his squad car, which then turned on the video recorder in his squad car and initiated a stop of the vehicle. PPFOF 3;DPFOF 14, 28, 30. A copy of the video is embedded here and also is found on YouTube at: https://www.youtube.com/watch?v=jIugUWBghqQ&t=90s.[3] *See also* Declaration of Nathaniel Cade, Jr. ("Cade Decl."), at Ex. 1 (Expert Report of Brian Landers), at 10.

Santiago initiated the stop near the corner of westbound North Avenue, just west of Oakland Avenue at 4:44:21 p.m., per the squad video, and Harris pulled over within 8 seconds of Santiago turning on his squad lights. Video, at 4:44:29 pm. PPFOF 3.

After initiating the stop, Santiago approached the vehicle 86 seconds after Harris pulled over and can be seen on video directing his flashlight towards the dashboard of Harris' vehicle in order to confirm the last four digits of the vehicle's VIN (vehicle identification number) with the four digits he had memorized were attributable to the license plates he had just run through the DOT database. PPFOF 4; Video, at 4:45:57 pm; Ex. 1 at 10; Ex. 3 at 28:15-20. Santiago admits that the last four digits of the VIN

---

[3] The video will hereinafter be referenced as "video" and specific time stamps, including the minute and seconds, as based on the video, will be identified. The time stamps identified are those on the actual video, which displays the time of day the actions took place. Although Defendants have placed a DVD in the record, *See* Smokowicz Affidavit, Attachment B, that video requires the Court to jump through proverbial hoops to watch the video and to have sound. The YouTube video eliminates those issues. In addition, Attorney Smokowicz cites to the time on the video for the Defendants' proposed findings of fact, rather than the *actual* time the various incidents and actions tale place. Plaintiff suggests the identification of times in this brief better articulate what actually occurred.

3

matched the last four digits of the VIN attributable to the vehicle's license plate. Santiago also confirmed that the vehicle make (Chrysler Sebring) and model (two door convertible) matched the DOT database. PPFOF 5. The only thing that Santiago believed did not match the DOT database was the vehicle's color. PPFOF 6.

Santiago then approached the driver's window and explained to Harris the purpose of the stop being that the color of the vehicle did not match. PPFOF 7; Video, at 4:46:06 pm; Ex. 1, at 10, citing to Ex. 3 (Santiago depo.) at 34:4; Ex. 2 at 47:19-48:11; DPFOF 23. Harris protested and indicated to Santiago that this mistake had occurred before, and that the police were wrong, as his vehicle was gray and had a special paint job. PPFOF 8. Santiago requested Harris' driver's license, which Harris provided. PPFOF 9; Video, at 4:46:27 p.m.; Ex. 2, at 44:25 to 47:13; DPFOF 19. Santiago did not return to his squad car to verify Harris' identity, whether Harris had a valid driver's license or determine if Harris had any outstanding tickets or warrants. PPFOF 10; Video, at 4:46:27 – 4:46:47 p.m.; Ex. 3, at 40:11-42:18.

Besides informing Santiago that this same mistake (i.e. mistaking car color) had occurred previously by Milwaukee Police, Harris also informed Santiago that he recently had shoulder surgery on his left shoulder and his arm was injured. PPFOF 11; Ex. 2, at 48:21 to 50:9; Ex. 3, at 69:10 to 71:11; DPFOF 25-27.

After receiving the driver's license, Santiago invited (and also instructed) Harris to get out of the vehicle and look at the computer in Santiago's squad car to see for himself that the DOT records indicated the vehicle was identified as black, not gray. PPFOF 12; Cade Decl., Ex. 1, at 10, 12 (citing to Santiago's interview with Detective Wilkerson) and 16; Ex. 3, at 59:10-23. However, immediately upon Harris exiting the

vehicle, Santiago directed Harris to the back of the vehicle, rather than to Santiago's squad car. PPFOF 13; Video, at 4:46:47 p.m. It appears as if the offer to view the squad computer was nothing more than a ruse to get Harris out of the vehicle. Ex. 1, at 17; DPFOF 24, 33.

Harris complied with Santiago's order to proceed to the back of the vehicle and as soon as Harris reached the back of the vehicle, Santiago instructed him to face the vehicle and began a frisk of Harris. PPFOF 14; Video, at 4:46:50 p.m.; Ex. 1, at 15. Santiago did not request, nor did he receive consent from Harris to search and frisk Harris. PPFOF 15; Ex. 1, at 17; Ex. 2, at 48:17-50:3; Harris Decl., at ¶ 3; Ex. 3, at 69:19-72:12. Also seen on the video at this time is Sims exiting the vehicle holding Harris' sling for his arm. Video, at 4:47:04 p.m. Santiago directs her to get back into the vehicle. Video, at 4:47:04 -4:47:12 p.m.

Immediately after searching Harris and discovering that Harris was not armed, Santiago ordered Harris to the sidewalk. PPFOF 16; Video, at 4:47:18 p.m. Harris complied. PPFOF 17; Video, at 4:47:22 p.m. At no point did Santiago invite Harris to the squad car to view the computer. Instead, Santiago can be seen on video getting into an argument of some kind with Harris, and several times Santiago is seen with his right hand reaching behind his back to grab his handcuffs. PPFOF 18; Video, at 4:47:26 p.m. Santiago admitted that he did not feel threatened by Harris, did not believe he was in danger and did not believe Harris to be armed or dangerous, nor did he believe that Harris was a flight risk. PPFOF 19; Cade Decl., Ex. 3, at 66:9-10, 20-23, 132:22-25, 137:16-21, 143:10-24; Ex. 1, at 15. Santiago also testified that he felt "comfortable" having Harris out of the vehicle and in his squad car to view the computer. PPFOF 20;

5

Cade Decl., Ex. 1, at 16, citing to Ex. 3, at 57:17-58:8. Clearly, Santiago was not concerned about his safety.

While engaged in a verbal argument with Harris, Santiago approaches Harris and grabs Harris' left arm (i.e. injured arm) to place handcuffs on Harris. PPFOF 21; Video, at 4:47:28 p.m. On the video, Harris is observed protesting Santiago's actions and refusing to turn around for Santiago. PPFOF 22; Video, at 4:47:28 – 4:47:36 p.m. Santiago then orders Harris to sit on the sidewalk, which order Harris does comply. *Id.* PPFOF 23. The verbal argument between Santiago and Harris continues, as Santiago is seen ordering Harris to now stand up, after having ordered him to sit down, and begins physically to pull out his handcuffs. PPFOF 24; Video, at 4:47:42 – 4:48:01 p.m. Harris continues to protest Santiago's attempts to place handcuffs on him, at which point Santiago forcibly grabs Harris by the left arm, but Harris pulls his left arm in towards his body. PPFOF 25; Video, at 4:48:01 – 4:48:37 p.m.

At this point on the video, Santiago and Harris are struggling with each other, both off and on camera, although flashes of the struggle could be seen through a second video camera that is directed towards the rear seats and rear passenger window of Santiago's squad car. Video, at 4:48:40 - 4:48:56 p.m. In the video, Sims is seen calmly walking towards Santiago and Harris, as they are struggling, and there is no suggestion that Santiago orders Sims back to the vehicle or that he is concerned with her as a second individual whom he has not frisked or searched, whom he knows nothing about her potential intentions. *Id.* PPFOF 3; Cade Decl., Ex. 1, at 14-15.

Although Santiago's personal camera microphone was not working, PPFOF 27; Cade Decl., Ex. 3 at 90:25-92:3, there is audio inside the squad car, and one can hear

Harris yell at Santiago "You can't do me like that" and one can hear Sims begging for a "supervisor." PPFOF 28; Video, 4:48:59 – 4:49:02 p.m. Again, although the struggle has moved to the side of the squad car and flashes of images are faintly discernible through the rear camera, Harris is heard on camera yelling that "You are ripping my stitches." PPFOF 29; Video, at 4:49:18 p.m. One also can observe a pedestrian walk calmly from East to West on the sidewalk and a jogger going West to East without any concerns about the dispute between Santiago and Harris. PPFOF 30; Video, 4:49:51 – 4:50:06 p.m. Sims is seen walking calmly back to the vehicle. PPFOF 31; Video at 4:51:09 p.m.

Officers Kapusta and Stelter, who were designated by the Department Dispatch as Unit 1269, *were not specifically* dispatched to and arrived at the scene at approximately 4:51:58 p.m. Video, at 4:51:38-4:51:58 p.m.; PPFOF 32; Cade Decl., Ex. 3, at Ex. 1.

Immediately upon arriving on the scene, Officers Kapusta and Stelter jumped into the fracas and tried to force both of Harris' arms behind him. Harris alleges that one or both of Kapusta or Stelter kicked him several times. The video is inconclusive at this point of time, although a reasonable jury could conclude that between the time periods of 4:52:11 and 4:52:14 p.m. it does appear as if movement suggests a kicking motion by an unidentified actor. *Id.* In fact, at the arrival of Kapusta and Stelter and the aforementioned "kicking", Harris is heard screaming loudly in pain. PPFOF 33; Video, at 4:52:14 - 4:52:30 p.m. He also is heard screaming about his arm. Video, at 4:52:30 – 4:52:32 p.m.

Subsequently, Harris clearly is heard screaming "get your knee off my head", video at 4:52:46 p.m., and then he again complains about his arm. *Id.*; PPFOF 34. An

unidentified officer is heard asking "what is wrong with your arm." PPFOF 35; Video, at 4:52:46 - 4:52:49 pm. Harris explains that he ". . . just got out of [sic] hospital." PPFOF 36; Video, at 4:52:50 pm.

Another Department squad car is heard and seen on video arriving on scene at 4:53:16 p.m., arriving from the West, heading East on North Avenue. PPFOF 37. Per the Department Dispatch, this is Defendant Walter McCullough (Unit 1213) arriving. PPFOF 37; Cade Decl. Ex. 3, at Ex. 1. Santiago is now seen directing Sims back into the Vehicle. PPFOF 38; Video, at 4:53:26 – 4:53:35. Finally, another Department squad car also appears from the West, heading East on North Avenue. Video, at 4:57:45 p.m. This is Officers Crystal Jacks and Eric Ratzmann arriving. PPFOF 39; Cade Decl., Ex. 3, at Ex. 1. Jacks is the only female officer involved, and she is seen on video at 4:54:00 p.m. Jacks approaches Sims, video at 4:54:18 p.m., orders her out of the vehicle, and begins a pat down search of Sims. PPFOF 40; Video, 4:54:20 – 4:55:14 p.m.

Around this time, an unidentified officer is heard stating ". . . under arrest." PPFOF 41; Video, at 4:55:38 p.m. Subsequently, Harris, already in handcuffs, is led to the Department's transport van. Video, at 4:55:37 p.m. In addition, an officer is seen on video checking the dashboard VIN of the vehicle. PPFOF 42; Video, 4:58:24 – 4:58:59 p.m.

Santiago and the other officers begin searching the vehicle. Video at 4:58:58 – 5:05:35 p.m. Harris did not give any of the officers permission to search his vehicle. PPFOF 44.

An identified officer and Santiago are overheard having the following exchange:

"Q: You got the plate?"
Santiago: "Yeah."

"Q: There is the VIN on the car. Does it match that?"
Santiago: "Yeah."

PPFOF 45; Video, at 5:04:05 to 5:04:13 p.m.

Had Santiago checked Harris' driver's license, he could have confirmed that Harris' driver's license was valid, there were no open or existing warrants for Harris, and that Harris has never been convicted of a crime. PPFOF 46, 47 and 48. Further, a police officer, after requesting a driver's license from a motorist, should verify whether the motorist has a valid driver's license is valid. PPFOF 49; Cade Decl., Ex. 8, at 14:4-24; Ex. 7, 24:4-25:15; Ex. 3, at 45:23-46:10.

Although he was aware that she was in the Vehicle, at no point on the video does it appear that Santiago ever requested any identification from Sims nor did he secure her before attempting to arrest Harris.

Santiago never informed the Department dispatcher or officers Kapusta and Stelter that Harris had an injured arm. PPFOF 50. Santiago never informed the Department dispatcher or Kapusta and Stelter that he offered to show Harris the computer in his squad car, that he conducted a frisk of Harris without consent or probable cause to do so, that he did not fear for his safety and did not believe Harris to be armed, or that he attempted to place Harris in handcuffs and arrest him without a legal justification to do so.

Officer Crystal Jacks testified that pursuant to Department training, officers such as herself and Santiago were trained that they should not remove suspects such as Harris from a vehicle pulled over for a traffic stop, and certainly should not invite a suspect out of the vehicle into a squad car to view the DOT computer. PPFOF 51; Cade

Decl., Ex. 1, at 13-14 (noting that Santiago should not have been trained to invite individuals into his squad car); Ex. 8, at 21:3-24:15.

Chief Flynn admitted that he is not aware of any requirement that an individual is required to sit on the ground when instructed to do so by a police officer. PPFOF 52; Cade Decl., Ex. 8, at 45:22-46:8.

Finally, this Court is free to consider the recent settlement decree that the City of Milwaukee has entered into with the ACLU and several plaintiffs over the Department's illegal stop and frisk policy of African-American males. *See Collins v. The City of Milwaukee*, E.D. Wisconsin Case No. 17-CV-0234, in which the Court served as a mediator in this matter, and counsel for Defendants represented the City of Milwaukee and Department. *See also*

https://www.jsonline.com/story/news/crime/2018/04/30/milwaukee-tentative-settlement-and-consent-decree-aclu-stop-and-frisk-police-lawsuit/567090002/[4]

## ARGUMENT

Santiago should never have engaged and stopped Harris' vehicle, as Wisconsin state law did not provide Santiago with probable cause to pull over a vehicle solely on the basis that the color of the vehicle appeared to be different than what Santiago believed it to be. Santiago further compounded the illegal seizure by having Harris step out of the vehicle and immediately performed a pat-down frisk without probable cause or permission to do so. Finally, Santiago attempted to place Harris under arrest without probable cause or a sufficient basis to do so. All of these illegal steps were performed by Santiago without a legal basis to do so.

---

[4] Milwaukee Journal Sentinel, online, visited and downloaded on April 30, 2018.

Santiago involved other officers of the Department when he called for back-up assistance but failed to inform any of the responding officers that Santiago illegally pulled over Harris' vehicle without probable cause and also failed to inform his fellow officers that Santiago had Harris exit the vehicle and attempted to place him in handcuffs without sufficient justification to do so.

The City of Milwaukee bears the burden of Santiago's illegal acts under *Monell* because of the Milwaukee Police Department's failure to train officers like Santiago as to what constitutes a proper basis to pull over a vehicle (and certainly not for an alleged color mismatch) and failure to train its officers as to what constitutes probable cause to frisk a citizen and attempt to place that citizen in handcuffs. The failure to train its officers properly or remove them from active duty if training was not sufficient, ultimately led to Harris suffering permanent injuries. Summary judgment is not appropriate.

## I.    THE APPROPRIATE SUMMARY JUDGMENT STANDARD.

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court is take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 47-248, 255 (1986)(emphasis added); *Schuetta v. Aurora Nat'l Life Assurance Co.*, 27 F. Supp. 3d 949, 955-56 (E.D. Wis. 2014), citing Fed.R.Civ.P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Schuetta*, 27F.Supp.43d at 956, citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Id*.

For purposes of this motion, the Court cannot weigh the evidence or decide which testimony is more credible. *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The Court's only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Amer. Hoescht Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The evidence, and all inferences, are viewed in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Equip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981); *Wray v. Nat'l R.R. Passenger Corp.*, 10 F.Supp.2d 1036, 1039 (E.D. Wis. 1998), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II.   HARRIS CONCEDES THAT HE DOES NOT HAVE EVIDENCE TO SUPPORT HIS EQUAL PROTECTION CLAIM.

Harris concedes that Defendants argument with regard to Harris' Equal Protection Claim is correct and agrees that the Court should grant the defendants motion for summary judgment *as to this issue only*.

**III.    SANTIAGO'S INITIAL STOP OF HARRIS' VEHICLE BASED ON SANTIAGO'S OBSERVATIONS OF THE COLOR OF THE VEHICLE WAS AN ILLEGAL SEIZURE UNDER THE FOURTH AMENDMENT.**

The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. Similarly, the Wisconsin Constitution also protects citizens from unreasonable search and seizures. *See* art. I, § 11 of the Wisconsin Constitution.

When Santiago initiated a traffic stop of the vehicle, he implicated the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Colorado v. Bannister*, 449 U.S. 1, 4 n.3. *See also State v. Popke*, 2009 WI 37, ¶ 11, 317 Wis. 2d 118, 765 N.W.2d 569 (citations omitted)("The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the Fourth Amendment."). At the point in time that Santiago initiated the traffic stop, Harris was "seized" as he was not free to leave or "disregard the police and go about his business." Defendants' Summary Judgment Brief, at 10, citing *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

A traffic stop is generally reasonable if officers have reasonable suspicion that a violation has been or will be committed or if they have probable cause to believe a traffic violation has occurred. Reasonable suspicion is based upon specific and articulable facts that together with reasonable inferences therefrom reasonably warrant a *suspicion* that an offense has occurred or will occur. *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968).

Officer Santiago indicated both in his police report and testified in his deposition that the basis for his decision to pull over Harris' vehicle was because Harris' vehicle

appeared to Santiago to be black, not gray, as it was identified in the Department of Transportation database. Cade Decl., Ex. 3, at 26:11-15, 28:15-20, and 34:4; Ex. 1, at 10. Assuming that fact to be true, Santiago's purported justification was illegal under Wisconsin law. More specifically, Wis. Stat. § 349.02(2)(c) provides that:

> Notwithstanding par. (a), **a law enforcement officer may not stop a vehicle solely because the vehicle's color differs from the color stated in the application for registration of that vehicle**. This paragraph does not limit the authority of a law enforcement officer to issue a citation for improper registration of a vehicle whose color differs from the color stated in the application for registration of the vehicle if the difference is observed in the course of a stop or inspection made for other purposes.

(emphasis added). *See also* Wis. Stat. § 341.335(1)(m)[5] and *State v. Laufer*, 2013 WL 5225660, *2 (Wis. Ct. App., Sept. 18, 2013);

Defendants argue, incorrectly, that the roadside stop of Harris was legal and reasonable. Defendants' Summary Judgment Brief, at 10-11, citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)("A *lawful* roadside stop . . . .")(emphasis added). And to bolster their argument that the stop was permissible, Defendants cite to Wis. Stat. §§ 341.25(1)(a), 341.08(2)(c) and 341.04(1) for the general proposition that Harris' registration of his vehicle was purportedly was incorrect, and thus, Santiago initiated a legal traffic stop. Defendants' Summary Judgment Brief, at 10-11.[6] Apparently,

---

[5] "No person is required to notify the department before the next renewal of registration for the vehicle that a vehicle's color has been changed from the color stated in the most recent application for registration of the vehicle." Thus, even if Harris had changed the color of the vehicle, state statute required that he notify the Department of Transportation the next time he registered the vehicle, *not immediately as Defendants suggest*. Driving a vehicle with the wrong color, standing alone, is not illegal.

[6] Defendants' argument in citing to these three Wisconsin statutes is borderline frivolous. Wis. Stat. § 341.25(1)(a) requires that a vehicle be registered. Harris' vehicle was properly registered, as Santiago confirmed by the DOT information displayed on his squad computer.

Wis. Stat. § 341.08(2)(c) requires certain things to be contained in an application for registration. But the statute does not make it illegal to drive a vehicle if the color of the vehicle is incorrect.

Defendants realize the error of Santiago's ways, as they couch the traffic stop as reasonable in light of a purported error in vehicle registration. But as noted, an officer cannot initiate a traffic stop based on incorrect color. Wis. Stat. § 349.02(c).

In reply, Defendants may argue, once they realize that Wis. Stat. §§ 349.02(2)(c) and 341.335(1)(m) are the correct and applicable statutes to this top, that although Santiago illegally initiated a stop, his error was a simple mistake, and therefore the seizure was legal. Indeed, the United States Supreme Court has "recognized that searches and seizures based on mistakes of fact can be reasonable." *Heien v. North Carolina,* __ U.S. __, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). "The limiting factor is that 'the mistakes must be those of reasonable men.'" *Id.* (quoted source omitted). However, it is not reasonable for Santiago to have initiated the stop of Harris as the current state statute, which has been in place since at least 2000,[7] is clear that an officer cannot initiate a stop based on a mistaken identification of a vehicle's color. *Laufer,* 2013 WL 5225660, *2. A reasonable person would not have made such a mistake. Indeed, a properly trained officer would not have made such a mistake, especially where such

---

Wis. Stat. § 341.04(1) makes it illegal to drive a vehicle that is not registered. Harris' vehicle was registered, so the citation to this statute, and the other two statutes, is frivolous.

Indeed, one of these statutes creates or implicates a crime being committed to justify a traffic stop. Moreover, even if Santiago, or the other officers in the Department, did not realize that they could not initiate a traffic stop based on mistaken identity of color of a vehicle, the fact that Defendants cite to these three statutes as the pretext for traffic stop is belied by Wis. Stat. § 341.335(1)(m), which clearly notes that a change to a vehicle color does not need to be reported until the next renewal. Defendants cannot claim it is illegal to drive the wrong colored car where the State of Wisconsin allows individuals to report the change of color at a later date. Defendants should be sanctioned for this frivolous argument.

[7] *See* 1999 Wisconsin Act 90, where the specific language was created, and the Act went into effect on July 1, 2000.

basic knowledge of the law is taught at the police academy. PPFOF 53; Cade Decl., Ex. 1, at 10-11.

Therefore, Santiago could not have had a "reasonable suspicion" to have initiated the stop of Harris' vehicle. A reasonable jury could find that the seizure of Harris was illegal and award Harris the damages that he suffered from the injury, which followed the natural flow of events beginning with the illegal stop. Summary judgment is not warranted.

## IV.   SANTIAGO DID NOT HAVE A LEGAL BASIS TO SEIZE AND ARREST HARRIS SUBJECT TO THE TRAFFIC STOP.

In support of the belief that merely placing Harris into handcuffs was not an unreasonable seizure, Defendants cite to *United States v. Stewart*, 388 F.3d 1079 (7th Cir. 2004) for the proposition that handcuffing an individual incidental to a traffic stop does not transform the stop into an arrest. However, *Stewart* is not applicable to this case. In *Stewart*, the arrest was subsequent to a legal traffic stop because the officer noted that the defendant matched the description of a bank robber, and thus, the officer had probable cause to initiate the stop and place the defendant in handcuffs while the investigation continued. Surprisingly, in reliance on *Stewart*, Defendants argue that Harris "cannot successfully contend, therefore, that he was arrested at the point when Officer Santiago merely tried to place handcuffs on Harris." Defendants' Brief, at 14. Yes, Harris can make such a contention for several reasons.

First, *Hodari D.* clearly indicates that "[A]n officer effects an arrest of a person whom he has authority to arrest, by laying his hand on him for the purpose of arresting him, though he may not succeed in stopping and holding him." 499 U.S. at 624, citing to *Whitehead v. Keyes*, 85 Mass. 495, 501 (1862). *See also Hodari D.*, 499 U.S. at 625,

citing A. Cornelius, <u>Search and Seizure</u> 163-164 (2nd Ed. 1930). So, it is clear that Harris could be under arrest, even before Santiago physically touched him. Context maters.

Second, Santiago placed Harris in handcuffs purportedly because he was upset and because he stated that Harris would not comply with his commands. Cade Decl., Ex. 3, at 135:23-136:5; Ex. 1, at 17-19; and, Ex. 8, at 18:22, 19:4, 48:4-6 and 53:22-25.

Third, Defendants admit, in citing to Wis. Stat. § 946.41(1) that in order to prove resisting arrest, an officer must be acting in an official capacity and with lawful authority. Here, Santiago did not have lawful authority, as the entire basis of the stop, which led to the arrest, was illegal and improper.

Fourth, in order to argue that he was justified to handcuff Harris, and then argue that the failure of Harris to submit was resisting arrest, it would be up to a jury to determine that *factual issue*, not Defendants in a motion for summary judgment. *United States v. Di Re*, 332 U.S. 581, 594 (1948)("One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases."). Even Chief Flynn agrees. Cade Decl., Ex. 8, at 53:22-25 ("If the only reasons are he's just raising his voice to protest the general circumstance and isn't making any other threatening moves, gestures, or phrases, I wouldn't certainly see grounds for arrest.").

## V.    SANTIAGO WAS NOT ENTITLED TO USE FORCE AGAINST HARRIS.

A police officer's use of force against a citizen is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7-9 (1985); *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Lester v. Chicago*, 830 F.2d 706, 709 (7th Cir. 1987). In order to determine the constitutionality of a seizure, the court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to

justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). Force is reasonable only when exercised in proportion to the threat posed. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 529–30 (7th Cir. 2012), quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010).

The right to use deadly force, moreover, is not absolute – crucially, if an officer's own unreasonable conduct creates the very danger used to justify deadly force, there is no governmental interest in the use of deadly force and qualified immunity is not appropriate. *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993)("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."). *See also Catlin v. City of Wheaton*, 574 F.3d 361, 369 n.7 (7th Cir. 2009) (explaining that the *Starks* holding presumably applies to non-lethal force situations as well).

Determining whether the force used by a particular officer to affect a particular seizure is "reasonable" under the Fourth Amendment requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Thus, a proper application of such a balancing test requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene. *Id.* The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to

18

their underlying intent or motivation. *Id.* at 397.

Defendants citation to *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2005) and its progeny is misplaced. Harris was not a "suspect" as the plaintiff in Thompson. Although Santiago purportedly believed that Harris had committed a traffic violation, that mistaken belief did not transform Harris into a suspect that allowed Santiago to arrest him, as there was no probable cause to initiate the stop or place Harris into handcuffs. *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1042-43 (7th Cir. 2005) (use of force where there is no probable cause to arrest in the first place violates the Constitution).

Here, in viewing the facts (and the YouTube video) in a light most favorable to Harris, a jury could find that Santiago's use of force against Harris was unreasonable and a violation of Harris' Fourth Amendment rights.

All of the above-described force was unreasonable because there was no basis to use *any force* against Harris. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (right to use force during a seizure derives from the right to arrest); *Herzog*, 309 F.3d at 1042-43 (use of force where there is no probable cause to arrest in the first place violates the Constitution). Where, as here, an officer uses disproportionate force during a *Terry* stop, then probable cause is required. *Matz v. Klotka*, 769 F.3d 517, 524-25 (7th Cir. 2014); *United States v. Sharpe*, 470 U.S. 675, 685–86, 1 (1985). There was no probable cause in this case; at most, Santiago had reasonable suspicion to conduct a field interview regarding an ordinance violation.[8] *Terry*, 392 U.S. at 30 (instructing officers to identify themselves and make reasonable inquiries in order to dispel his suspicions).

---

[8] Interestingly, although Santiago issued a municipal traffic citation to Harris, no subsequent prosecution occurred.

Regardless, even if there were probable cause to arrest Harris for an alleged ordinance violation, it was unreasonable for Santiago to attempt to do so by grabbing Harris for his refusal to sit on the ground where Harris posed no threat to Santiago. *Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir. 1996) ("police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); PPFOF 54; Cade Decl., Ex. 8, at 45:22-46:8. Merely claiming that he had a reason to arrest Plaintiff does not *per se* grant Santiago the right to use force, let alone excessive force; here, under Plaintiff's version of facts, there was no justification whatsoever for any force to be used.

Defendants subsequently argue that because Harris allegedly was resisting arrest, that Santiago's actions are proper. Defendants brief, at 14-18. Defendants view this matter through the wrong lens, as defendants incorrectly believe that an illegal arrest justifies the arrest if the subject of the arrest resists. Without a doubt, the law allows someone in Harris' position to resist the improper use of force by Santiago. *United States v. Di Re*, 332 U.S. 581, 594 (1948) ("One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases."); *State v. Reinwand*, 147 Wis. 2d 192, 200-01, 433 N.W.2d 27, 31 (Wis. App. Ct. 1988); *State v. Hobson*, 218 Wis. 2d 350, 366-67, 577 N.W.2d 825, 832 (Wis. 1998) (no right to actively resist "peaceful" arrest, but right to resist if officers use unreasonable force remains intact and is derived from Wisconsin's self-defense statute). *See also* Cade Decl., Ex. 8, at 53:22-25 ("If the only reasons are he's just raising his voice to protest the general circumstance and isn't making any other threatening moves, gestures, or phrases, I wouldn't certainly see grounds for arrest.").

Moreover, police officers may not manufacture the basis for using force, deadly

or otherwise, against an arrestee solely to justify the arrest. *Sledd v. Lindsay,* 102 F.3d 282, 288 (7th Cir. 1996). The Seventh Circuit has explained that where an officer unreasonably creates the encounter that leads to the use of force, the normal rules governing use of force and right to resist are modified. *Id.*; *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."); *Catlin v. City of Wheaton,* 574 F.3d 361, 369 n.7 (7th Cir. 2009) (explaining that *Starks* holding presumably applies to non-lethal force situations as well). Here, Santiago unreasonably created the encounter that led to the use of force. His initial stop was the beginning of a series of actions that led to Harris suffering debilitating and permanent injuries.

Moreover, this Court should consider that Officer Santiago first used force against Harris when he grabbed Harris' injured arm in an attempt to place him under arrest. Using force of any kind against a citizen without probable cause to place the citizen under arrest constitutes a serious intrusion onto a citizen's Fourth Amendment interests; using force against a citizen suspected of an alleged minor traffic violation is even more distasteful. *Herzog*, 309 F.3d at 1042-43. At the point in time that Santiago attempted to arrest Harris, Santiago, at best, only suspected that Harris had committed a very minor offense - possessing a vehicle that purportedly had a different color than in a DOT database, which would result in a $50 fine.

Also, at that point in time of attempting to arrest him, Harris had not engaged in any behavior to suggest to Santiago or any other reasonable police office that Harris did not pose a threat to anyone's safety or that he might flee if ordered by a police officer to

stop.  Under these facts, a jury could reasonably conclude that Santiago's initial use of force against Harris was unreasonable: Santiago used significant force in against a person who was suspected of committing only a minor statutory offense, posed no immediate threat to the safety of the officer or others, and was not actively resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396; *Abbott v. Sangamon County*, Ill., 705 F.3d 706, 732 (7th Cir. 2013) (noting that it is well established in the Seventh Circuit that police officers cannot use significant force on non-resisting or passively resisting suspects); *Payne*, 337 F.3d at 779  (holding that officer's use of less than lethal force on suspect was objectively unreasonable where suspect was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with minor offenses); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever"); *see also Young v. County of Los Angeles,* 655 F.3d 1156, 1166–67 (9th Cir. 2011)("it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to the officer or public safety.").

Defendants, indirectly, seem to argue that Harris might have attacked him once he was on the side of the road on North Avenue in Milwaukee. It is of course possible that Harris might have attempted to do these things, but that possibility exists in every police encounter with a citizen and does not by itself justify the use of force. *See Ellis v. Wynalda*, 999 F.2d  243, 246–47 (7th Cir. 1993) (police officer is not entitled to assume

that a felon is carrying a weapon simply because it is possible that every felon might be carrying a weapon, and the officer may use force designed to prevent the felon from using a weapon only if the officer has a "particular reason to believe" that the suspect is armed); *Clash*, 777 F.3d at 1048 ("police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever"). When Santiago first used force against Harris, the Plaintiff had not engaged in any behavior that suggested he was violent or likely to flee from the police, and he was suspected of having committed only very minor offenses. Thus, a reasonable jury could conclude that Santiago had no cause to use substantial force against Harris without first ordering him to stop or providing him with a warning.

## VI.    QUALIFIED IMMUNITY IS NOT AVAILABLE TO THE DEFENDANTS BASED ON THEIR ACTIONS AFTER THE ILLEGAL STOP OF HARRIS' VEHICLE.

All of the individual defendants in this case claim their actions are protected by qualified immunity, which would shield them from liability for civil damages, but only insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether the defendants are entitled to qualified immunity, the Court must analyze and answer two questions: (1) whether a constitutional right is violated based on Harris' version of the facts as the non-movant; and if yes, (2) whether the constitutional right was clearly established at the time of the alleged violation. *Viilo v. Eyre*, 547 F.3d 707, 709-10 (7th Cir. 2008); *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013).

The dispositive inquiry to determine if a right is clearly established is whether it

Case 2:14-cv-01002-LA   Filed 05/03/18   Page 23 of 33   Document 73

would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012). "This standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013), quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012). The inquiry the Court conducts must be "undertaken in light of the specific contact of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198-199 (2004). Indeed, the inquiry is "particularized" based on the facts confronting the officer. *Id.*

A police officer is not entitled to qualified immunity where facts related to the underlying constitutional violation are disputed. *Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998)("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity. Raising a defense of qualified immunity in the face of disputed facts that control the answer to the question is a waste of everybody's time."); *Omdahl v. Lindholm*, 170 F.3d 730, 734 (7th Cir. 1999) ("[W]hether the [plaintiffs] can establish the existence of a constitutional violation turns on how a fact-finder resolves the question of fact regarding deadly force. The existence of a factual dispute prevents us from resolving the issue."); *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) (no qualified immunity where there are disputed issues of fact as to the force used).

Here, there are numerous facts, when viewed in the light most favorable to Harris, that would bar the Court from providing blanket qualified immunity to the individual

defendants.

A. <u>The Numerous Violations of Harris' Constitutional Rights</u>[9]

First, Santiago did not have a legal basis to pull over the vehicle based on what he perceived to be a different color than what was contained in the DOT database. Wis. Stat. § 349.02(2)(c) (". . . a law enforcement officer may not stop a vehicle solely because the vehicle's color differs from the color stated in the application for registration of that vehicle."). Santiago could have followed Harris for a period of time to observe if Harris was committing other crimes or actions but making the decision to pull the vehicle over based on color was illegal.

Second, even after illegally pulling Harris' vehicle over and making contact with Harris, who provided a valid driver's license, Santiago offered to show Harris the squad car computer that purportedly detailed that the vehicle's color was incorrect per DOT, Santiago immediately did a pat down and frisk search of Harris without permission to do so or a reasonable basis. PPFOF 15. *See also* Letter dated March 29, 2018 from Attorney Joseph M. Russell to Hon. J.P. Stadtmueller in *Collins v. City of Milwaukee*, E.D. Wis. 17-CV-00234), ECF #90 (in the letter, Attorney Russell, on behalf of the City of Milwaukee, cites to a specific directive from interim Milwaukee Police Chief Alfonso Morales).

Third, Santiago attempted to arrest Harris without probable cause or a legal basis to do so. *Herzog*, 309 F.3d at 1042-43.

Finally, Kapusta and Stelter were involved in arresting Harris but without a legal right to do so. If Santiago was wrong to initiate the arrest, then so are Kapusta and

---

[9] As noted previously, each of the actions undertaken by the defendants Santiago, Kapusta and Stelter is visible on the squad videotape in one fashion or another.

Case 2:14-cv-01002-LA   Filed 05/03/18   Page 25 of 33   Document 73

Stelter.

B.  Harris' Constitutional Rights Were Established prior to November 19, 2010

The second inquiry a court must make with regards to qualified immunity is whether the constitutional rights that were violated were known by the officer prior to the action that took place. *Viilo*, 547 F.3d at 709-10. Here, Santiago knew (or should have known) that he could not stop a vehicle solely on the basis of the color appearing to be different than the DOT records. Wis. Stat. § 349.02(2)(c) was enacted in 2000. In addition, Santiago was trained (or should have been trained) by the Milwaukee Police Department that he could not initiate a vehicle stop solely on the basis of a mismatch of the vehicle's color. Cade Decl., Ex. 1, at Ex. M ("Vehicle Contacts A Training Guide For Law Enforcement 2002).

Santiago also knew or should have known based on his purported training by the Department that he is not allowed to initiate a pat down or frisk of a citizen absent probable cause to do so (i.e. articulated concern that the citizen is armed and dangerous) pursuant to a *lawful stop*. *See Terry*, 392 U.S. at 30; *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). *See also* Cade Decl., Ex. 1, at 15, citing to Ex. J (Van Hollen 2009 at p. 58) and 16, citing to Cade Decl., Ex. 8, at 19:2-4 (". . . you wouldn't routinely just pat somebody down on the street because they committed a traffic violation."). The stop was not lawful, as noted.

Finally, Kapusta and Stelter knew or should have known that they did not have a right or probable cause to search Harris' vehicle.

In short, Santiago knew or should have known, based on his Department training, as well as statutes and case law in existence *prior* to November 19, 2010 that his actions

26

were impermissible and a violation of Harris' constitutional rights. Kapusta and Stelter also knew or should have known that as well that they could not search the vehicle or injure Harris without justification. Qualified immunity is not appropriate in this matter as a shield to protect these individual defendants from their known violations of Harris' constitutional rights.

## VII. THE SEARCH OF THE VEHICLE, AS DEMONSTRATED ON THE SQUAD VIDEO, WAS UNLAWFUL.

Defendants argue that the search of the vehicle was permitted because it contains evidence of the offense of arrest. Defendants' brief, at 18, citing *Arizona v. Gant*, 556 U.S. 332, 351 (2009). The minimal amount of their brief attributable to this argument suggests that the Defendants know this argument is a stretch, at best.

Santiago never had a valid reason to initiate the stop of the vehicle. And because he did not have a valid and legal reason for the stop, the justification for the subsequent search also fails. The search of the vehicle was not a lawful search incident to Harris' arrest because Harris should never have been arrested.

Finally, as to the qualified immunity, although addressed below generally, Defendants suggest that it is up to Harris to identify a case or law that says the search of the interior of the vehicle to determine the registration issue was illegal. Again, Defendants try to make something Harris' burden that is not his to bear. Every person has a right to be free from an illegal search and seizure by government actors; Harris is no different. The Defendants knew or should have known that they lacked probable cause (or even a suspicion) in order to initiate the traffic stop based on the vehicle's color. Once it is illegal to initiate the stop, the search also becomes illegal. And certainly, during their police academy training the individual defendants knew or should have

27

known that in order to search a vehicle, absent exigent circumstances, a warrant is necessary. No warrant was ever issued.

**VIII.  HARRIS HAS PUT FORWARD ENOUGH EVIDENCE TO SUSTAIN HIS _MONELL_ CLAIM AGAINST CHIEF FLYNN AND THE CITY OF MILWAUKEE BASED ON THEIR FAILURE TO TRAIN, SUPERVISE OR DISCIPLINE OFFICERS FOR ILLEGALLY PULLING CARS OVER SOLELY BASED ON A VEHICLE'S COLOR.**

Defendants final argument in support of their notion for summary judgment is that the City of Milwaukee should not bear any liability for the actions of the individual defendants under _Monell_[10] because Harris purportedly cannot prove that any individual officer inflicted a constitutional harm on the Plaintiff. Defendants' argument is misplaced and wrong. Here, as noted above, Harris has more than proved the violation of his constitutional rights. In addition, Chief Flynn and the City bear liability under _Monell_ because of the failure of the Department to properly train, supervise, or even discipline its officers for the constitutional violations in incidents similar to the illegal stop of Harris.

For example, in _City of Canton v. Harris_, 489 U.S. 378 (1989), the Supreme Court held that respondent's civil rights claim was cognizable only if petitioner's failure to train its police force reflected a deliberate indifference to the constitutional rights of its inhabitants, vacated the judgment of the court of appeals, and remanded the case for further proceedings to determine whether respondent should have had an opportunity to prove her case under the "deliberate indifference" rule. _Id.,_ 489 U.S. at 388-90. More to the point, under _Harris_, the viability of a failure to train claim is heavily dependent on the facts presented in the record of the particular case. In general, the record must contain sufficient evidence to establish the following facts: (1) a violation of a federally-

---

[10] _Monell v. Department of Social Services of City of New York,_ 436 U.S. 658 (1978).

protected right; (2) inadequate training of employees; and (3) causation between the inadequate training and the plaintiff's injury. It is only when these three factors converge that the governmental entity can be held liable for constitutional harm caused a citizen. *Id*.

The Seventh Circuit also has stated that a plaintiff must show more than one incident (i.e. constitutional violation) to prove that *Monell* liability against a municipality may lie. *See Glisson v. Indiana Department of Corrections*, (7th Cir. 2016)("[W]here a plaintiff alleges that a lack of a policy caused a constitutional violation, she must produce "more evidence than a single incident to establish liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 822-23 (1985)). Indeed, a plaintiff must produce evidence of a "series of incidents" (*Hahn v. Walsh*, 762 F.3d 617, 638 (7th Cir. 2013), cert. denied, 135 S. Ct. 1419 (2015)), or a "widespread practice constituting custom and usage." *Phelan v. Cook Cnty.*, 463 F.3d 773, 789 (7th Cir. 2008) (a "widespread practice" argument "would focus on the application of the policy to many different individuals").

Evidence of a series of incidents permits the inference that "there is a true municipal policy at issue," and allows the factfinder "to understand what the omission means." *Calhoun*, 408 F.3d at 380. By presenting a series of incidents where "the same problem has arisen many times and the [government entity] has acquiesced in the outcome," a plaintiff has produced sufficient evidence that the lack of policy is in fact a de facto policy choice, not a discrete omission. *Id*.

Alternatively, *Monell* liability also may attach where a municipality fails to supervise or discipline employees. *Lemons v. City of Milwaukee*, 2016 WL 3746571

29

(E.D. Wis. July 8, 2016)(noting that a failure-to-investigate, supervise, or discipline theory can support a finding of municipal liability "because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts."); *Sigle v. City of Chicago*, 2013 WL 1787579, *2 (N.D. Ill. Apr. 25, 2013). Again, deliberate indifference is required for liability. *Id.*

In cases alleging inadequate supervision, if a program does not prevent constitutional violations, municipal decision makers may be put on notice that a new program is called for, and their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard of the consequences, i.e., the deliberate indifference, for municipal liability. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407 (1997). Similarly, a custom of failing to discipline police officers "can be shown to be deliberately indifferent if the need for further discipline is so obvious and procedures so inadequate as to be likely to result in the violation of constitutional rights such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline." *Sigle*, 2013 WL 1787579 at *3 (internal quotation marks omitted).

Here, the training of Officer Santiago was inadequate. He knew or should have known that under Wisconsin law and his Department training, that he did not have a legal justification to stop Harris' vehicle based on the color. But it was not just Santiago who did not know what to do. All of the Department officers who responded to the scene had conflicting and different ideas and beliefs of what should take place when the color of the vehicle purportedly does not match what is contained in the DOT database. That suggests, if nothing else, that the Department has no or inadequate training on the issue,

although per Plaintiff's expert, it is a requirement that this particular issue be taught during police academy training. PPFOF 53, 60-64; Cade Decl., Ex. 1, at Ex. M (Vehicle Contacts) and Ex. 8, at 10:12-11:3. There is no justification for each of the officers who responded to have a different understanding of what Santiago legally should have done that evening. Indeed, such a basic lack of training and understanding of the law is evident at the top of the Department, for *even Flynn thought that officers have a right to initiate a traffic stop for the discrepancy color of a vehicle*. PPFOF 60-63; Cade Decl., at Ex. 8, at 19:6-21:7. Such a lack of training is enough to hold the City of Milwaukee liable under *Monell*.

Even more disappointing than the lack of training, however, is that Santiago's flouting of the law was not the first time this type of incident had occurred. Not only did Santiago lack probable cause in similar incidents with other motorists, i.e. pulling over a vehicle solely because its color does not match what is stated in the DOT records in violation of state law, but the other officers who responded to the illegal arrest of Harris also had similar issues with other vehicles. And despite numerous similar incidents occurring, the Department never counseled the officers that their actions were improper or illegal, or instructed them on the correct way to handle such a situation. Instead, the Department did nothing, which is tantamount to acquiescing as to the illegal conduct. Again, *Monell* counsels that the City of Milwaukee is liable for such acquiescence. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)("[i]f the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that ... cannot support municipal liability."); *A. v. Nutter*, 737 F.Supp.2d 341, 362 (E.D. Pa.

31

2010)(finding that "plaintiffs have adequately plead that municipal officials acquiesced in existing [deficient] DHS customs, and this is sufficient to state a claim under Monell").

Finally, the head of the Department, Chief Ed Flynn, knew or should have known what the law requires and that this issue was occurring, either because of reports from his officers or the lack of training at the police academy, and despite such knowledge, did nothing about it. PPFOF 60-63; Cade Decl., Ex. 8, at 23:3-24:18. He did not issue Department policies or notices, did not suggest remedial or additional training, and did not specifically tell his officers to stop doing it.[11] Here, silence from the top is tantamount to expressly condoning of the action. *See., e.g. Glisson v. Indiana Dept. of Corrections*, 2018 WL 465780 (7th Cir. 2016)(lack of a policy can cause a constitutional violation). Again, *Monell* provides that liability against Chief Flynn and the City of Milwaukee is available.

## IX.    BECAUSE HARRIS HAS PROPERLY PLED HIS FEDERAL CLAIMS AGAINST DEFENDANTS, IT IS APPROPRIATE FOR THIS COURT TO MAINTAIN AND EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS.

Using Defendants' argument to its logical extreme, Defendants all but concede that if this Court denies Defendants' motion for summary judgment, then Harris also should be allowed to proceed on his state law claims. Harris agrees.

---

[11] In anticipation of an argument from the Defendants in their reply that such "direction" from the Chief of Police is not easily accomplished, the Court only needs to review the prompt and specific orders issued by Chief Alfonso Morales, who specifically ordered officers to cease and desist of the illegal stop and frisk policies that were the hallmark of the Flynn era. *See* Cade Decl., Ex. 9. Chief Flynn, while he was at the Milwaukee Police Department, easily could have provided similar notices to the officers of the Department. He chose to nothing instead.

## CONCLUSION

Defendants' motion for summary judgment should be denied. Santiago did not have a legal basis to initiate the stop of Jimmy Harris, and his lack of a legal basis is what led ultimately to his fellow officers participating in the illegal act and Chief Flynn and the City having *Monell* liability. Jimmy Harris has suffered debilitating and permanent injuries as a result of Santiago's initial action, and the Defendants need to face a jury to address the injuries suffered.

Dated this 3rd day of May, 2018.

**CADE LAW GROUP LLC**

By: s/Nathaniel Cade, Jr.
    Nathaniel Cade, Jr.
    P.O. Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com

    Attorneys for Plaintiff