UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JIMMY HARRIS,

    Plaintiff,

v.

CITY OF MILWAUKEE, OFFICER FROILAN SANTIAGO, OFFICER MARK KAPUSTA, OFFICER STEVEN STELTER, CHIEF OF POLICE EDWARD FLYNN, and SERGEANT WALTER MUCULOUGH,

    Defendants

Case No.: 14-CV-1002

Jury Trial Demanded

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

    1.    Officer Santiago was in his patrol car and following behind Harris and made the decision to check Harris' license plates. Declaration of Nathaniel Cade, Jr. ("Cade Decl."), Ex. 3, at 25:19-23.

    2.    Santiago informed the Department dispatcher that he was pulling over the vehicle due to a color discrepancy per the DOT records. Cade Decl., Ex. 3, at Ex. 1.

    3.    Santiago initiated the stop of Harris' vehicle near the corner of westbound North Avenue, just west of Oakland Avenue at 4:44:21 p.m., per the squad video, and Harris pulled over within 8 seconds of Santiago turning on his squad lights. Cade Supplemental Declaration, Ex. 9, YouTube video ("Video"), at 4:44:29 pm. The video is being presented to the Court on a flash drive, and also is embedded as a link in the Brief in opposition to the Defendants' Motion for Summary Judgment.

4.     After initiating the stop, Santiago approached the vehicle 86 seconds after Harris pulled over and can be seen on video directing his flashlight towards the dashboard of Harris' vehicle in order to confirm the last four digits of the vehicle's VIN (vehicle identification number) with the four digits he had memorized were attributable to the license plates he had just run through the DOT database. Video, at 4:45:57 pm; Cade Decl., Ex. 1 at 10; Ex. 3 at 28:15-20.

5.     When he inspected the vehicle's dashboard, Santiago admits the last four digits of the VIN matched the last four digits of the VIN attributable to the vehicle's license plate. Santiago also confirmed that the vehicle make (Chrysler Sebring) and model (two door convertible) matched the DOT database. Cade Decl., Ex. 3, 28:15-20, 96:3-5.

6.     The only thing that Santiago believed did not match the DOT database was the vehicle's color. Cade Decl., Ex. 3, 42:10-13.

7.     Santiago then approached the driver's window and explained to Harris the purpose of the stop being that the color of the vehicle did not match. Video, at 4:46:06 p.m.; Cade Decl., Ex. 1, at 10, citing to Ex. 3 (Santiago depo.) at 34:4; Ex. 2 at 47:19-48:11.

8.     Harris protested being pulled over and indicated to Santiago that this mistake had occurred before, and that the police were wrong, as his vehicle was gray and had a special paint job. Cade Decl., Ex. 3, 40:19-41:13, 44:3-20.

9.     Santiago requested Harris' driver's license, which Harris provided. Video, at 4:46:27 p.m.; Cade Decl., Ex. 2, at 44:25 to 47:13.

10. Santiago did not return to his squad car to verify Harris' identity, whether Harris had a valid driver's license or determine if Harris had any outstanding tickets or warrants. Video, at 4:46:27 – 4:46:47 p.m.; Cade Decl., Ex. 3, at 40:11-42:18.

11. Harris also informed Santiago that he recently had shoulder surgery on his left shoulder and his arm was injured. Cade Decl., Ex. 2, at 48:21 to 50:9; Ex. 3, at 69:10 to 71:11.

12. After receiving the driver's license, Santiago invited Harris to get out of the vehicle and look at the computer in Santiago's squad car to see for himself that the DOT records indicated the vehicle was identified as black, not gray. Cade Decl., Ex. 1, at 10, 12 (citing to Santiago's interview with Detective Wilkerson) and 16; Ex. 3, at 59:10-23.

13. When Harris got out of his car, Santiago directed Harris to the back of the vehicle, rather than to Santiago's squad car. Video, at 4:46:47 p.m.

14. Harris complied with Santiago's order to proceed to the back of the vehicle and as soon as Harris reached the back of the vehicle, Santiago instructed him to face the vehicle and began a frisk of Harris. Video, at 4:46:50 p.m.; Cade Decl., Ex. 1, at 15.

15. Santiago did not request nor did he receive consent from Harris to search and frisk Harris. Cade Decl., Ex. 1, at 17; Ex. 2, at 48:17-50:3; Ex. 3, at 69:19-72:12; Harris Decl., at ¶ 3.

16. Santiago searched Harris and then ordered him to the sidewalk. Video, at 4:47:18 p.m.

17. Harris complied with Santiago's order to stand on the sidewalk. Video, at 4:47:22 p.m.

18. Santiago can be seen on video getting into an argument of some kind with Harris, and several times Santiago is seen with his right hand reaching behind his back to grab his handcuffs. Video, at 4:47:26 p.m.

19. Santiago admitted that he did not feel threatened by Harris, did not believe he was in danger and did not believe Harris to be armed or dangerous, nor did he believe that Harris was a flight risk. Cade Decl., Ex. 3, at 66:9-10, 20-23, 132:22-25, 137:16-21, 143:10-24; Ex. 1, at 15.

20. Santiago also testified that he felt "comfortable" having Harris out of the vehicle and in his squad car to view the computer. Cade Decl., Ex. 1, at 16, citing to Ex. 3, at 57:17-58:8.

21. While engaged in a verbal argument with Harris, Santiago approaches Harris and grabs Harris' left arm (i.e. injured arm) to place handcuffs on Harris. Video, at 4:47:28 p.m.

22. On the video, Harris also is observed protesting Santiago's actions and refusing to turn around for Santiago. Video, at 4:47:28 – 4:47:36 p.m.

23. Santiago then orders Harris to sit on the sidewalk, which order Harris does comply. *Id.*

24. The verbal argument between Santiago and Harris continues, as Santiago is seen ordering Harris to now stand up, after having ordered him to sit down, and begins physically to pull out his handcuffs. Video, at 4:47:42 – 4:48:01 p.m.

25. Harris continues to protest Santiago's attempts to place handcuffs on him, at which point Santiago forcibly grabs Harris by the left arm, but Harris pulls his left arm in towards his body. Video, at 4:48:01 – 4:48:37 p.m.

26. In the video, Sims is seen calmly walking towards Santiago and Harris, as they are struggling, and there is no suggestion that Santiago orders Sims back to the vehicle or that he is concerned with her as a second individual whom he has not frisked or searched, whom he knows nothing about her potential intentions. *Id*. *See also* Cade Decl., Ex. 1, at 14-15.

27. Santiago's personal body microphone was not working. Cade Decl., Ex. 3 at 90:25-92:3.

28. In the audio for the video from the squad car, Harris yells at Santiago "You can't do me like that" and one can hear Sims begging for a "supervisor." Video, 4:48:59 – 4:49:02 p.m.

29. Harris also is heard on camera yelling that "You are ripping my stitches." Video, at 4:49:18 p.m.

30. In the video, a pedestrian is observed walking calmly from East to West on the sidewalk and a jogger going West to East, apparently without any concerns about the dispute between Santiago and Harris. Video, 4:49:51 – 4:50:06 p.m.

31. Sims is seen walking calmly back to the vehicle while Harris and Santiago are in their dispute on the side of squad car. Video at 4:51:09 p.m.

32. Officers Kapusta and Stelter, who were designated by the Department Dispatch as Unit 1269, *were not specifically* dispatched to and arrived to the scene at approximately 4:51:58 p.m. Video, at 4:51:38-4:51:58 p.m.; Cade Decl., Ex. 3, at Ex. 1.

33. After being kicked once Kapusta and Stelter arrives, Harris is heard screaming loudly in pain. 4:52:14 - 4:52:30 p.m. He also is heard screaming about his arm. Video, at 4:52:30 – 4:52:32 p.m.

34. Harris also is heard screaming "get your knee off my head" and then he again complains about his arm. Video at 4:52:46 p.m.

35. An unidentified officer is heard asking "what is wrong with your arm." Video, at 4:52:46 - 4:52:49 pm.

36. Harris explains that he ". . . just got out of [sic] hospital." Video, at 4:52:50 pm.

37. Another Department squad car is heard and seen on video arriving on scene at 4:53:16 p.m., arriving from the West, heading East on North Avenue. Per the Department Dispatch, this is Defendant Walter McCullough (Unit 1213) arriving. Cade Decl., Ex. 3, at Ex. 1.

38. At the same time that McCullough arrives, Santiago is seen directing Sims back into the vehicle. Video, at 4:53:26 – 4:53:35.

39. Officers Crystal Jacks and Eric Ratzmann arrive around 4:57:45 p.m.. Video, at 4:57:45 p.m.; Cade Decl., Ex. 3, at Ex. 1.

40. Jacks approaches Sims, video at 4:54:18 p.m., orders her out of the vehicle, and begins a pat down search of Sims. Video, 4:54:20 – 4:55:14 p.m.

41. An unidentified officer is heard stating something to the effect of ". . . under arrest." Video, at 4:55:38 p.m.

42. An officer is seen on video checking the dashboard VIN of the vehicle. Video, 4:58:24 – 4:58:59 p.m.

43. Santiago and the other officers began searching the vehicle after Harris is led away. Video at 4:58:58 – 5:05:35 p.m.

6

44. Harris did not give any of the officers permission to search his vehicle. Harris Declaration, at ¶ 4.

45. While the search of the vehicle is occurring, an identified officer and Santiago are overheard having the following exchange:

> "Q: You got the plate?"
> Santiago: "Yeah."
> "Q: There is the VIN on the car. Does it match that?"
> Santiago: "Yeah."

Video, at 5:04:05 to 5:04:13 p.m.

46. Harris' driver's license was valid. Harris Declaration, at ¶ 5.

47. There were no open or existing warrants for Harris. Harris Declaration, at ¶ 6.

48. Harris has never been convicted of a crime. Harris Declaration, at ¶ 7

49. According to Milwaukee Police policy, a police officer, after requesting a driver's license from a motorist, should verify whether the motorist has a valid driver's license is valid. Cade Decl., Ex. 8, at 14:4-24; Ex. 7, 24:4-25:15; Ex. 3, at 45:23-46:10.

50. Santiago never informed the Department dispatcher or officers Kapusta and Stelter that Harris had an injured arm. Cade Decl., Ex. 3, at 141:11-17.

51. Officer Crystal Jacks testified that pursuant to Department training, officers such as herself and Santiago were trained that they should not remove suspects such as Harris from a vehicle pulled over for a traffic stop, and certainly should not invite a suspect out of the vehicle into a squad car to view the DOT computer. Cade Decl., Ex. 1, at 13-14; Ex. 8, at 21:3-24:15.

52. Chief Flynn admitted that he is not aware of any requirement that an individual is required to sit on the ground when instructed to do so by a police officer. Cade Decl., Ex. 8, at 45:22-46:8.

53. Officers are generally trained at the police academy that they cannot initiate a stop solely based on color. Cade Decl., Ex. 1, at 10-11.

54. Chief Edward Flynn testified that "If the only reasons are he's just raising his voice to protest the general circumstance and isn't making any other threatening moves, gestures, or phrases, I wouldn't certainly see grounds for arrest.". Cade Decl., Ex. 8, at 53:22-25

55. Santiago admitted in his deposition that he has had several occasions to pull over vehicles where the color did not match the DOT database. Cade Decl., Ex. 3., at 34:12-35:20.

56. Kapusta stated in his deposition that he does not recall if he has had occasions to pull over vehicles where the color did not match the DOT database, and does not recall if he ever received training as to how to handle such situation. Cade Decl., Ex. 4, at 35:12-36:17.

57. Stelter admitted in his deposition that he has had numerous occasions to pull over vehicles where the color did not match the DOT database. Cade Decl., Ex. 5, at 24:17-25:4, 26:12-28:1.

58. Ratzmann stated in his deposition that he does not know if he has ever pulled over vehicles where the color did not match the DOT database. 31:6-32:25.

59. Jacks admitted in her deposition that she has at least twice pulled over vehicles where the color did not match the DOT database. Cade Decl., Ex. 7, at 16:12-18:21.

60. Chief Flynn believes that his officers have a legal right to pull over vehicles where the color of the vehicle does not match the database because it creates a reasonable suspicion. Cade Decl., Ex. 8, at 19:16-25.

61. Chief Flynn also believed that after verifying that the VIN, make and model matched the DOT database, but the color did not, an officer could continue the stop. Cade Decl., Ex. 8, at 20:18-21:7.

62. The Milwaukee Police Department does not have a Department policy with regards to vehicles where the color does not match DOT records. Cade Decl., Ex. 8, at 23:3-24:18.

63. Chief Flynn does not believe that he needed to issue a Department policy regarding discrepancy between VIN and color identification of a vehicle. Cade Decl., at Ex. 8: 75:11-76:23.

64. Stelter indicated that he was not trained how to handle a situation of a vehicle where the color did not match other than initiating the stop and checking the VIN. Cade Decl., Ex. 5 at 29:7-31:21; 39:3-18.

Dated this 3rd day of May, 2018.

                              **CADE LAW GROUP LLC**

                              By: <u>s/Nathaniel Cade, Jr.</u>
                                    Nathaniel Cade, Jr.
                                    P.O. Box 170887
                                    Milwaukee, WI 53217
                                    (414) 255-3802 (phone)
                                    (414) 255-3804 (fax)
                                    nate@cade-law.com

                                    Attorneys for Plaintiff